## TERMINALS FOR THE CINCINNATI SOUTHERN RAILWAY AND THEIR LOCATION.

[Superior Court of Cincinnati, General Term.]

THE CITY OF CINCINNATI, BY SOLICITOR, v. THE TRUSTEES OF THE CINCINNATI SOUTHERN RAILWAY ET AL.

Decided, December 28, 1903.

*Eminent Domain—A Continuing Power in the Cincinnati Southern Railway Trustees—Location of Terminals—Not Ultimately Fixed by the Yards and Facilities Established in Mill Creek Bottom— Location of New Terminals Approved—Abandonment of Part of Land Sought to be Condemned.*

The trustees of the Cincinnati Southern Railway, by their action in acquiring property and locating terminals in the vicinity of Mill creek, did not disclose an intention to make those terminals the sole and ultimate terminals of the railway in this city, nor did they thereby exhaust their power for acquiring land for that purpose. On the contrary, the act of April, 1898, confirms and amplifies the power originally possessed by the trustees in that behalf, and the topographical features of the city and its railway requirements justify the location of the principal terminals on the lower ground near the river, as has been done. The omission of certain property, covered by the declaratory resolution and petition for condemnation, did not vitiate or render void the entire proceeding, but was within the discretion vested in the trustees. Moreover, there is statutory provision, applicable to others and by implication

362     SUPERIOR COURT OF CINCINNATI.

Cincinnati v. Trustees Cincinnati Southern Ry. [Vol. I, N S.

to this railway, for the abandonment, even after verdict, of any or all of the property sought to be condemned and appropriated for railway purposes.

HOSEA, J.; SMITH, J., and FERRIS, J., concur.

This cause comes up on reservation from the court at special term, upon demurrer of the trustees to the petition filed by the city and the demurrer of the city to the answer of The Cincinnati, New Orleans & Texas Pacific Railway Co., lessees of the Cincinnati Southern Railway (herein referred to as the "lessee company").

The petition sets forth in substance the various acts of legislation under which the Board of Trustees of the Cincinnati Southern Railway was organized; the proceedings of the trustees whereby the railway was located to and between its terminal cities; the adoption and publication of a policy respecting the location of the bridge over the Ohio river, and the location of freight and passenger depots; the leasing of the road to the lessee company; the acquisition of lands in the west end between the Ohio river and Harrison avenue, and expenditure for the same and for filling thereon, in behalf of the lessee company; and avers that, by the acquisition and filling of said lands, the trustees practically appropriated the lands between McLean avenue on the east, the B. & O. S. W. R. R. on the west, Hopkins street on the north, and Eighth street on the south; and that the trustees expended all the funds authorized up to that date, excepting a small balance, and had no power to provide further funds for terminal facilities.

The petition then sets forth the act of April 23, 1898, and the popular vote thereon, authorizing the modification and extension of the lease for sixty (60) years to October 12, 1966; the issue of bonds to an aggregate amount of $2,500,000 for terminal facilities and permanent betterments; and the execution of the modified and extended lease and the agreement respecting the issue of the bonds in installments and for corresponding increased rentals under the lease.

The petition then proceeds to set forth the resolutions and proceedings for the condemnation of the property between Vine, Plum, Commerce and Water streets, and also for securing rights of way connecting same with the previously described property

at the west end; and alleges that in the condemnation proceedings the verdicts aggregated $1,349,347.66; and sets forth an agreement of the trustees alleged to be of "doubtful validity," to omit from condemnation certain property included in the condemnation resolution of January 24, 1903, which omission made said verdicts aggregated less than otherwise would have been the case; and further alleges in detail the probable expense to be incurred in perfecting the rights of way connecting this and the west end properties, which expense, together with the cost of the condemnation proceedings, leaves nothing for the construction of round-houses, repair-works, machine-shops, or like necessary structures within the city limits for which it is alleged the trustees have made no provision.

The petition then alleges that this suit is brought upon the request of E. A. Ferguson, a tax-payer; that the lessee company by reason of the supplemental agreement and extension of lease, providing for the approval of its location, etc., of all lands and structures acquired and made by the trustees, claims by virtue of said agreement some interest in the proceeds of sales of the bonds and the expenditures of the same.

Upon this status of fact it is claimed that the expenditures made and to be made from the bond sales, as indicated, are and will be a breach of trust and a misapplication of the funds of the city within the control of the trustees; and this court is asked to perpetually enjoin the trustees from expending any of said proceeds in the purchase or appropriation of said property, or the connecting rights of way described.

Upon a prior special demurrer, the several trustees sued as individual defendants were dismissed in their individual capacity from the case. The lessee company answers, denying that by the acquisition of the lands in the west end of the city described, all the necessary terminal facilities had been provided and located; avers that the northern terminus of the road is the city of Cincinnati, and that the tracks leading to the local terminals within said city are not branch lines; and setting forth the agreement of modification and extension of the lease and the proceedings of the trustees in condemning the property between Vine and Plum streets; it avers its own written request for and consent

364     SUPERIOR COURT OF CINCINNATI.

Cincinnati v. Trustees Cincinnati Southern Ry. [Vol. I, N. S.

to the location and acquisition of the same, and its like approval of the omission of the specified property from the condemnation proceedings; and further, that the property acquired will provide sufficient terminal facilities.

The trustees demur to the petition and the city demurs to the answer of the lessee company, and the consideration of the entire case is reserved to the general term, upon what are thus questions of law, inasmuch as the demurrers admit only facts well pleaded and not conclusions of law.

The main question presented by the pleadings and argued to us at the hearing is, in brief: Whether the trustees, by their action heretofore in acquiring property and locating terminals and tracks in the vicinity of Mill creek in the west end of Cincinnati, did so legally locate the terminals of and complete the Cincinnati Southern Railway as to exhaust their powers as to any further location of terminals? It is claimed that under the general power of the trustees to build a railway between the two cities, the incidental power of eminent domain ceased upon the completion of the road between, and the location and acquisition of terminals within said cities. The theory upon which this objection proceeds is, that the acts and declarations of the trustees with respect to the Mill creek property amount to a legal location of the Cincinnati terminals at said point; that the acquisition and filling of lands for the track-way north on McLean avenue constituted a virtual appropriation of all the lands lying between this line on the east and the B. & O. S. W. railway on the west; and that the power of the trustees to provide further terminal facilities being thus exhausted, the act of 1898, providing funds, must be construed as limited to the improvement of this particular location, and not to authorize the acquisition of new territory.

The act of 1898, and the contracts for the modification and extension of the lease, were before this court at the general term of 1902, upon objections to the act as unconstitutional, and to the contracts as invalid, an abuse of the corporate powers of the city and in excess of the powers of the trustees.

The court found against all of these objections, and its action was subsequently affirmed by the Supreme Court on authority of *City of Cincinnati* v. *Taft,* 63 O. St., 141.

It is at least significant, that, while the precise question here under consideration was not there involved, the main facts upon which it rests were incidently assumed, and no such objection as is now urged seems to have occurred to any one. Section 5 of the act of 1898, declares that:

"The said trustees shall expend the said fund in providing terminal facilities for said railway, and in making permanent betterments upon the line thereon," etc.

In the discussion of the contract made under this statute, this court, in its opinion in the case referred to, delivered by Judge Smith, said:

"It may well be surmised that the parties to this agreement found it impracticable to state these matters with greater particularity. They could not foresee the time required to *finally determine the location* most to be desired for the terminals nor the length of time required to *negotiate for the land needed;* nor if unsuccessful in securing it by negotiation, the length of time required to *acquire it by appropriation proceedings.*

"The purpose of having proper terminal facilities and permanent betterments is not the improvement of the appearance of the railway. It is a business purpose. It enables it more expeditiously to handle its traffic as well as a larger volume of the same. The terminals and betterments therefore increase the income of the lessees; and, as the amount the lessee is willing to obligate itself to pay must depend upon the income it hopes to make out of the railway, it necessarily follows that with proper terminal facilities and permanent betterments, a lessee might agree to pay a large rental, where without them it may be willing to pay only a much reduced rental, or perhaps not to enter upon a lease at all."

The proposition that the trustees exhausted their power as to acquiring terminals by the purchase of land and laying of tracks on and near McLean avenue in the west end, is untenable as it seems to us from every point of view.

So far as the argument rests upon views and intentions of the trustees in respect of their acquisition of the west end property—that the ultimate and sole terminals should be located thereon—we find no evidence of such intention in any of the resolutions of the board; and it can not reasonably be implied from any of their acts in the premises. The temporary character of the purposes to

366      SUPERIOR COURT OF CINCINNATI.

Cincinnati v. Trustees Cincinnati Southern Ry. [Vol. I, N. S.

be subserved by such acquisition is sufficiently apparent from the
declaration of the trustees cited to us, explanatory of the reasons
for locating the Ohio river bridge opposite that point; which nat-
urally, and for the time being at least, necessitated nearby shipping
facilities in order to make the road practically operative at the
earliest possible moment.

The claim made in the petition that the extension of the tracks
upon McLean avenue virtually appropriated the territory west of
same to the B. & O. S. W. tracks, for the purpose of ultimate term-
inals, seems to us to have no staple foundation. To utilize it as
such would require a fill over the entire territory to a depth (as
stated in argument) of twenty-five to forty feet, at a cost prac-
tically prohibitive, and, moreover, would seriously handicap the
road for all time by the remoteness of the location from the
business and hotel districts of the city.

It seems much more reasonable to presume from the relation
of this property to the vast manufacturing interests located and
to be located in the Mill creek valley, and to the various import-
ant connecting railways passing out of the city adjacent to the
property acquired, an intention to secure the west end property as
yard room for convenience of transfer and storage purposes in
respect of interchanged traffic, as part perhaps, of the ultimate
system, but assuredly not all, nor even the principal of its terminal
facilities.

As to the power of the trustees to be exercised under the act in
question, we can entertain no doubt. Considering the important
character of the trust, it is not to be supposed that it was ever
intended by the Legislature to minimize and confine the powers of
the trustees in the premises, but rather to amplify them to the full
measure of the necessity; and certainly if it depended upon ques-
tions of mere statutory construction, we should feel constrained
to apply the most liberal rules recognized by the practice of courts
in such cases.

But in this case there is no necessity for resort to technical
rules. We think the act of May 4, 1869, under which the resolu-
tion of the city council of Cincinnati was passed authorizing the
construction of a railroad between Chattanooga and Cincinnati,
gave to the trustees, by necessary implication, the power to build

not only *to,* but *into* those cities, and to provide such terminal facilities as in their judgment would best subserve the main purpose in view, namely, to fully build and complete a railroad, efficient in every respect, for traffic between Cincinnati and the south.  It is therefore not to be supposed that their power was intended to be territorially limited to, so as to reach the corporate boundaries of the terminal cities only, but that they could locate terminals at any point within such boundaries; and if it were so, the subsequent act, authorizing them to "provide terminal facilities," without further specification, must be construed as confiding to them ample power to be exercised according to their sound discretion.

Nor can we perceive, in the acquisition of the property between Vine and Plum streets, any hint or suggestion of an abuse of such power.  On the contrary, taking into view the general railroad situation as it exists in the city of Cincinnati, as a fact of general public knowledge—the topographical features practically compelling the use of the "bottoms" adjacent to the river for the heavy business of the city and for terminals of railroads entering the city at a corresponding level through the radial valleys—it seems to us a justifiable assumption and quite within the discretionary power of the trustees, to hold that the ultimate terminals of the Cincinnati Southern Railway should be located in that general locality.  This is an obvious deduction also from the facts of the situation showing the concentration of the terminals of other leading railways in that section of the city.  These facts fairly, as we think, determine the necessity of such location of terminals for the Cincinnati Southern Railroad, as a means of enabling it to compete on equal terms for the carrying business it was built to transact.

The principle involved was settled by the Supreme Court of Ohio in the case of *The Toledo & Wabash Railway Co.* v. *Daniels et al,* 16 O. St., 390, with respect to private railway corporations.  The court adopt the opinion of the Supreme Court of Illinois in a similar case, in part, as follows:

"One of these views is that the road itself having been actually completed and running, the power to condemn land either for

368 SUPERIOR COURT OF CINCINNATI.

Cincinnati v. Trustees Cincinnati Southern Ry. [Vol. I, N. S.

track of the road or for depots or other appendages is exhausted. In this view we can not concur.

"It would indeed be a disastrous rule to hold that a railroad company must in the first instance acquire all the grounds it will ever need for its own convenience or the public accommodation. * * * * We can not suppose it was the intention of the Legislature to oblige the company to acquire all the land in the first instance which in any event it should ever require, to do the largest amount of business it may ever attain. The greatest degree of sagacity could hardly determine precisely what conveniences the future might demonstrate to be necessary to do its business with facility.

" 'Prime facie,' say our own Supreme Court, 'power to do any act, is to do it in such manner and at such time as is usual, convenient and reasonable—in such way as prudent men manage their own concerns' " (Id.)

If, therefore, private corporations organized for building railroads may exercise the power of eminent domain as and where the necessity arises, as a continuing power to accommodate the growth and development of the road, a fortiori the Legislature in providing for the building of a great public highway such as that in question, for the public benefit, intended to confer upon the trustees charged with the execution of the work a no less ample power.

The further objection urged at the hearing, namely, that in agreeing to omit a certain portion of the property covered by their declaratory resolution and by their petition in the condemnation proceedings the trustees vitiated and rendered void the entire proceeding, does not seem to us well taken.

If, as intimated in the petition, the agreement so to do was invalid, then certainly the proceedings are not vitiated thereby; moreover as the terms of the agreement are not set forth, non constat it may have given to the trustees rights even more beneficial to the main purpose than would have resulted from the condemnation; and one fact certainly is significant, namely, that the trustees are saved about a quarter of a million dollars in expenditure; and there is no allegation showing that the main purpose of the condemnation is in any way impaired. We must presume, therefore, that the omission was made for some beneficial purpose.

The objection is based as a matter of law, upon the decision of our Supreme Court in *Grant* v. *The Village of Hyde Park*, 67 O. St., 166. As we understand the effect of this decision it protects the right and interest of a property owner directly involved in the condemnation proceeding in the public work as a whole. The suit was based upon the attempt of the village council as a legislative body to change its plan and purpose with respect to the work in hand, after the institution of condemnation proceedings, without notice to the property owners whose interests were involved in the carrying out of the original plan.

Land was being condemned for street purposes upon certain plans and specifications establishing the grade, contour, etc., of a public street. The change made was a violation of the statutory mode prescribed for making such appropriation, and materially changed the character of the case itself as to evidence relating to the effect of a different grade upon the land abutting, and upon the character, usefulness and expense of the road itself.

In such a case a public street must be regarded as a unit, and it is obvious that the rights of every abutting owner are involved in changes affecting any part (Peck's Mun. Laws of Ohio, pp. 133, 134).

Moreover with respect to such proceedings relating to streets and like public works the council is a legislative body employed in a governmental capacity; while in this case the trustees, although exercising powers of a public nature, act, nevertheless, in a proprietary capacity just as any individual might do—for the railway is not a public highway in the sense of a street, but an avenue and means of traffic utilized for gain and not open to the public for free use. See *Cincinnati* v. *Cameron*, 33 O. St., 336; *Cleveland* v. *Construction Co.*, 67 O. St., 197; *Oliver* v. *City of Worcester*, 102 Mass., 489.

The Hyde Park case does not apply to the present consideration for still other reasons. In the case at bar the rights of the individual owners are not in any way connected. Each stands in an exclusive and individual relation to the purposes of the condemnation. The taking of the land of each exhausts his interest in the subject matter. There remains no continuing interest as in the

case of a street which passes over or adjacent to his land and which he is entitled to use in the future.

But again under the acts authorizing and the statutes regulating condemnation proceedings by the trustees, they may abandon as to any owner, being liable only for costs, expenses and attorneys fees (42 O. St., 239). If they may abandon even after verdict there appears to be no good reason why they may not do so before unnecessary expenses are incurred, if for any proper reason they see fit so to do; and in the present case no abuse of their discretionary power is charged. In fact, the power of entry and appropriation given under Rev. Stats., Section 3281, seems to give as full power in the premises by fair intendment, as could be exercised by any railway corporation, even if it were not deducible from other conditions referred to; and the principle of the right to abandon the condemnation proceedings, as to all or part of lands, by railway companies, is now well settled.

The last objection suggested, namely, as to the agreement whereby the selection of terminal sites, etc., was to be approved by the lessee company, is one that is substantially answered by this court in *Cincinnati* v. *Ferguson,* 12 O. D., 439. The agreement in this case, as in that, was carefully worded so as to yield only so far as they legally might—which, in fact, is no surrender at all. As there is no conflict between the parties concerned, based upon any such assertion of right in the premises, the objection need not be considered further. As to the allegation that funds have not been reserved to build round-houses, etc., in the city of Cincinnati, it is obvious that conditions might require their location elsewhere on the line of the road. Such an objection pertaining to a detail of the practical operation of the road seems to us without force in the present consideration.

Considering the whole case, as presented, we think the demurrer of the trustees should be sustained; and as the contention involves only questions of law, the petition should be dismissed.

Demurrer of trustees sustained and petition dismissed.

*Chas. J. Hunt,* for plaintiff.

*John R. Sayler,* for trustees.

*Edward Colston,* for C. N. O. & T. P. Ry. Co.